IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID C. TATE | : | CIVIL ACTION |
| v. | : | No. 14-4609 |
| SPECIAL AGENT HASARA, et al. | : | |

### MEMORANDUM

Juan R. Sánchez, J.                                                   October 2, 2017

      Philadelphia Police Lieutenant Daniel Brooks, the sole remaining Defendant in this civil rights action brought pursuant to 42 U.S.C. § 1983, seeks entry of summary judgment in his favor as to pro se Plaintiff David C. Tate's claims that Brooks fabricated identification evidence against him and maliciously prosecuted him for firearm-related offenses. Tate cross-moves for summary judgment on both claims. Because Tate has failed to produce evidence from which a reasonable jury could find Brooks violated his constitutional rights, Brooks's motion is granted, and Tate's motion is denied.

### FACTS[1]

      Tate's claims arise out of his arrest and prosecution on firearm-related charges of which he was ultimately acquitted following a bench trial in the Court of Common Pleas of

---

[1] The following facts are drawn from the evidence in the summary judgment record, which includes a one-page excerpt from the docket in Tate's underlying criminal case, *Commonwealth v. Tate*, No. CP-51-CR-0010576-2011 (Pa. Ct. Com. Pl.). *See* Pl.'s Mot. for Summ. J. Ex. B. To provide some context with respect to the criminal proceedings against Tate, the Court has consulted the full criminal docket—available at https://ujsportal.pacourts.us/DocketSheets/ CPReport.ashx?docketNumber=CP-51-CR-0010576-2011—a matter of public record of which the Court may take judicial notice. *See Kreider v. Philhaven Adolescent Inpatient Treatment Ctr.*, No. 13-7242, 2014 WL 1395061, at *2 n.11 (E.D. Pa. Apr. 9, 2014); *cf. S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (holding that in resolving a motion to dismiss a court "may properly look at public records, including judicial proceedings," and "may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity"). Except where otherwise specifically noted, the following facts are undisputed.

Philadelphia County in September 2012. The firearm in question was recovered from the Beaumont Lounge, a Philadelphia bar, in the early morning hours on Sunday, March 6, 2011. At that time, then-Sergeant Brooks was supervising a team of four officers conducting a "nuisance bar enforcement detail," targeting certain bars that were deemed to be nuisances based on civilian complaints, including the Beaumont Lounge. *See* Hr'g Tr. 54, July 2, 2012.

Upon arriving at the Beaumont Lounge, Brooks heard music coming from inside and observed people drinking outside the bar. After calling for a patrol wagon, Brooks and his team entered the bar whereupon a large group of males standing around a pool table threw down their pool cues and ran to the men's room. Brooks and the other officers followed the group, and when Brooks opened the door to the men's room, a small room equipped with only a single toilet and sink, at least six men rushed out. Although the men attempted to run past the officers, Brooks and his team were able to detain three of them.

Brooks then entered the men's room, where he observed marijuana in the toilet and more marijuana and a pistol on the floor around the toilet. The pistol was a Ruger 9-millimeter semi-automatic pistol bearing the serial number 317-68665.

After surveying the bathroom, Brooks had the three detained men secured and brought outside to the sidewalk in front of the bar. Sometime later, while Brooks was speaking with uniformed officers outside the bar, a man approached Brooks and asked if he could have house and car keys belonging to one of the detained men, claiming the man was his cousin. Although Brooks had seen the man who approached him before, he did not know the man's name, and he did not give the man the keys as the cousin did not wish to do so. Brooks later identified the man who approached him as Tate.

2

Later in the day on March 6, Sherrae Luise-Johnson reported to the Philadelphia Police Department that a gun had been stolen in a burglary of her home. The gun Luise-Johnson reported as stolen was the same gun that was recovered from the bathroom of the Beaumont Lounge.

The following day, on Monday, March 7, 2011, Special Agent Joseph Hasara, a member of the Pennsylvania Attorney General's Gun Violence Task Force, took over the investigation of the gun. Brooks thereafter did nothing further to investigate the gun.[2]

Hasara determined that the gun had been purchased a few days earlier, on March 3, 2011, by Luise-Johnson at the Tree Line Gun Shop in Norristown, Pennsylvania. Hasara then went to the Tree Line Gun Shop, where he obtained the paperwork completed by Luise-Johnson and reviewed video surveillance footage of the transaction. The video depicted Luise-Johnson entering the store with a man—later identified as Tate—behind her. After entering the store, Luise-Johnson and the man accompanying her approached the counter, and Luise-Johnson walked down the counter a few steps. The man accompanying Luise-Johnson then called her back to him and pointed at least twice to a firearm in the counter, which Luise-Johnson purchased.

---

[2] Although the property receipt for the gun, which had been prepared by one of the other members of Brooks's team, indicated the gun should be submitted for fingerprinting and DNA testing, there is no evidence in the record as to whether such testing was ever completed. *See* Pl.'s Mot. for Summ. J. Ex. C (interrogatory response no. 13, indicating Brooks does not recall whether the gun was ever fingerprinted). There is thus no evidence to support Tate's assertion in his summary judgment papers that Brooks and others intentionally withheld the results of the tests, which would have exculpated him.

In response to Tate's interrogatories, Brooks also agreed he did not obtain any surveillance video footage from the Beaumont Lounge, explaining he was not aware of any surveillance cameras on the property. *See id.* (interrogatory response no. 8). There is no evidence in the record as to whether the Beaumont Lounge had surveillance cameras, or whether video footage of the bar existed for March 6, 2011.

3

As part of his investigation, Hasara reviewed photographs of the three men who were detained at the Beaumont Lounge[3] and determined that none of them was the man depicted in the surveillance video. Hasara also made several attempts to interview Luise-Johnson at her residence. During one of the those attempts, on April 13, 2011, Hasara and another agent entered the open door to the residence's enclosed front porch, knocked on the inner door to the home, and were waiting for a response when another man approached the home, leaving his car double parked in the street with the engine running. The man started to enter the door to the front porch, where Hasara and his colleague were standing, but quickly turned, walked back to his car, and drove away. Hasara recognized the man as the same person who accompanied Luise-Johnson to the gun store, and he and his colleague made note of the man's license plate number.

Later that day, Hasara ran a Bureau of Motor Vehicles (BMV) check on the license plate and determined that the car was registered to David Tate. Hasara also conducted a background investigation of Tate, obtaining a copy of his current driver's license, from which Hasara determined Tate was the man depicted in the surveillance video, and his prior criminal record, which included convictions for third-degree murder, voluntary manslaughter, and other offenses.

On April 18, 2011, Hasara and another agent interviewed Luise-Johnson at the police station. When confronted with the video from the gun store, Luise-Johnson told the agents that she had purchased the gun for Tate in exchange for payment of $1,000. Luise-Johnson recounted that Tate had driven her to the gun store, told her what kind of gun to buy, and given

---

[3] The three detained men were ultimately charged criminally, two with drug offenses and one with being underage.

her the cash to pay for the gun. After she purchased the gun, Tate drove her home and then left with the gun and ammunition.

On April 21, 2011, Hasara contacted Brooks by phone about the events at the Beaumont Lounge on March 6, 2011. After speaking with Hasara by phone, Brooks met with Hasara in person. During one of these interactions, at Hasara's request, Brooks viewed Tate's driver's license photo and identified Tate as the man who had approached him outside the Beaumont Lounge about obtaining his cousin's keys.[4] Brooks did not identify Tate as having been inside the bar on the night in question. Hasara took a handwritten statement from Brooks during their in-person meeting, but Brooks did not sign the statement or the photograph he identified as depicting Tate, believing that, as a police officer, he was not required to do so.[5] Apart from speaking to Hasara by phone and in person, Brooks had no other involvement in Hasara's investigation regarding the gun recovered from the bathroom of the Beaumont Lounge.

Approximately one week later, on April 27, 2011, Hasara obtained a warrant for Tate's arrest for numerous offenses related to the purchase of the gun, including criminal conspiracy, violations of the Uniform Firearms Act (including possession of a firearm by a felon), tampering with public records, and unsworn falsification to authorities. Hasara sought the warrant based on Luise-Johnson's statement, his conversation with Brooks, the video surveillance footage from

---

[4] At a suppression hearing held more than a year later, Brooks and Hasara gave different accounts of the circumstances in which Brooks viewed the photo of Tate. Hasara recalled that it was during his phone call with Brooks that he asked Brooks to access Tate's photo in the BMV system to determine if Brooks had seen Tate at the Beaumont Lounge at the time the gun was recovered. Brooks recalled that Hasara showed him Tate's driver's license photo when he and Hasara met in person after their initial phone call.

[5] In addition to contacting Brooks, who was the supervising officer during the nuisance investigation, Hasara also made efforts to contact the other officers who were present at the Beaumont Lounge on March 6. Hasara may have spoken with some of the other officers, but none of them provided any information of value to his investigation.

5

the gun store, and his sighting of Tate at Luise-Johnson's home on April 13, all of which contributed to his affidavit of probable cause. Tate was arrested on May 9, 2011, when he came to the police station to retrieve his car, which had been impounded after police spotted it outside the Beaumont Lounge a few days earlier.[6]

Prior to trial, Tate's counsel moved to suppress Brooks's out-of-court identification of Tate as having been present at the Beaumont Lounge on the night the gun was recovered on the basis that the identification procedure used by Hasara—i.e., having Brooks view a single photo of Tate—was unduly suggestive and led to an unreliable identification. *See* Suppression Hr'g Tr. 3, July 2, 2012. Defense counsel also moved to suppress any in-court identification of Tate by Brooks for lack of an independent basis for such an identification. *See id.* Following a suppression hearing on July 2, 2012, the trial court granted the motion to suppress in an order issued on August 14, 2012.[7] *See Commonwealth v. Tate*, No. CP-51-CR-0010576-2011, Docket at 9-10. The case proceeded to a bench trial on September 12, 2012, following which the trial court adjudged Tate not guilty of all charges. *See id.* at 10.

In August 2014, Tate, who was then incarcerated on other charges, commenced the instant civil action. In his original Complaint, Tate asserted claims against six defendants: the Assistant District Attorney (ADA) who prosecuted the underlying criminal case, Special Agent Hasara, an unidentified Philadelphia police sergeant (later determined to be now-Lieutenant

---

[6] In June 2011, after Tate was arrested, Luise-Johnson gave a further statement to police, in which she apparently claimed to have purchased the gun not for Tate but for an individual named Christopher Cooley. The record contains no information about this later statement other than the fact that Luise-Johnson implicated Cooley. *See* Hr'g Tr. 18, July 2, 2012. Cooley and Luise-Johnson were each subsequently charged in related criminal cases. *See Commonwealth v. Tate*, No. CP-51-CR-0010576-2011, Docket at 1 (listing criminal cases against Sherrae Luise and Christopher Cooley as "Joined Codefendant Cases").

[7] The order granting Tate's suppression motion is not part of the summary judgment record.

6

Brooks), the City of Philadelphia, the Philadelphia District Attorney's Office, and the Philadelphia Police Department. By Order of August 11, 2014, the claims against the ADA, the DA's Office, and the Police Department were dismissed with prejudice, and the claims against the City—as well as any claims for false arrest and imprisonment against the two individual Defendants—were dismissed without prejudice. Order, Aug. 11, 2014, ECF No. 2. Tate thereafter filed an Amended Complaint, asserting claims against the City, Hasara, and the unidentified police sergeant.[8] In August 2015, the Court dismissed the claims against the City with prejudice and declined to reconsider its earlier dismissal of the false arrest and imprisonment claims. Order, Aug. 3, 2015, ECF No. 17.

Although Tate's § 1983 claims against Hasara and the unidentified police sergeant were not dismissed, as of August 2015, neither Defendant had been served, Hasara because Tate had not provided an address at which service could be made and the police sergeant because Tate had not yet identified him.[9] In September 2015, Tate identified Brooks as the previously unidentified police sergeant and, after one failed service attempt and an in-court status conference, in which Tate participated by videoconference, the City of Philadelphia Law Department eventually

---

[8] Between January and August 2015, attempts were made to find pro bono counsel for Tate, but those attempts were unsuccessful.

[9] In his pleadings, Tate identified Hasara as a member of the "Joint taskforce 18th District," and listed his address as 5510 Pine Street, Philadelphia, PA, the 18th District Headquarters. Although the Marshals Service attempted to serve Hasara based on the information Tate provided, the summons was returned unexecuted with a notation that the City does not have a designation of "Special Agent" and would need a first name in order to identify Hasara as a City employee. The Court thereafter directed the City to make reasonable efforts to determine, based on the information in Tate's pleadings, whether Hasara was a City employee and whether it could accept service on his behalf. After further investigation, the City advised the Court it was unable to accept service for Special Agent Hasara because it had no record of any current Philadelphia Police Department employee with the last name Hasara who was also employed by the Department on or about May 9, 2011, when the arrest giving rise to Tate's claims occurred.

accepted service for Brooks in February 2016. During the status conference, the City advised the Court and Tate that Hasara had been employed by the Pennsylvania Attorney General's Office, not the City, at the time of the events in question. While the parties contemplated that Tate would use this information to serve Hasara, the Court subsequently learned that Special Agent Hasara had retired from the Attorney General's Office in September 2015 and passed away in December 2015. Tate has since elected to pursue only his claims against Brooks.

As it pertains to Brooks, Tate's Amended Complaint focuses on Brooks's allegedly false identification of Tate outside the Beaumont Lounge. Tate also faults Brooks for failing to collect video surveillance evidence from the bar and not asking the other officers who were present at the bar whether they saw Tate there at the time the drugs and gun were recovered. Construing Tate's allegations liberally, the Court has interpreted the Amended Complaint to assert a Fourteenth Amendment fabrication of evidence claim and a Fourth Amendment malicious prosecution claim against Brooks. Following a period of discovery, both parties have moved for summary judgment.

**DISCUSSION**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which

it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (alteration in original) (citation and internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

In evaluating a motion for summary judgment, a court must "view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). Where, as here, cross-motions for summary judgment are filed, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (alteration omitted) (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

As to Tate's fabrication of evidence claim, in *Black v. Montgomery County*, decided during the pendency of this case, the Third Circuit Court of Appeals held "an acquitted criminal defendant may have a stand-alone fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment if there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." 835 F.3d 358, 371 (3d Cir. 2016). In defining the contours of such a claim, the Court of Appeals has stressed that there are "hurdles facing a plaintiff alleging a due process violation for fabrication of evidence."